**Smith v. McCollum**

*Nancy Larkin-Taylor,* for appellant.
*Andrew W. Young,* for appellee.

WAITE, *J.,* December 6, 2005—This is an appeal from our order entered on October 28, 2005, denying appellant Craig B. McCollum Jr.'s petition for primary custody of the parties' 3-year-old daughter (Child). Appellant cites 18 separate reasons in support of his appeal in his statement of matters complained of on appeal. The eighteenth reason lists 25 sub-parts. Essentially, at issue is whether we should have awarded custody to appellant because appellee Valerie Smith's living conditions were not as comfortable as appellant's. Appellant seems to suggest that because he has the greater financial wherewithal and the more stable family background, the best interests of the Child would be served by being in his primary custody.

The parties appeared before Judge Susan Devlin Scott of this court on December 13, 2004, at which time a temporary order was entered granting appellant partial custody of the Child three out of four weekends for 10 months of the year, and during the other two months in the summer, the parties are to alternate weeks. The parents were directed to attend at least six sessions of co-parenting counseling. The parties complied with that order.

The parties agreed to attend the Court Conciliation and Evaluation Service (CCES).[1] Under the temporary custody order, the parties were to share legal custody of the Child. Prior to the entry of the temporary order, the parties completed the CCES process and on August 10, 2004, a CCES Evaluation Report was submitted to and reviewed by the court, and is a part of the record. The evaluator observed that the Child was comfortable with both parents, yet had a closer bond with appellee, something to be expected because of the greater time spent together. The report recommended that the Child remain in the primary physical custody of appellee. The evaluator noted the difficult circumstances under which appellee operated and those circumstances will be discussed below; however, he concluded that appellee was a competent parent who was doing a good job raising the Child.

Appellant filed his petition to modify the custody arrangement so that he would be awarded primary physical custody of the Child. Two hearings were held on appellant's petition. Both parties testified as to the history of their interaction, primarily focusing on the purported shortcomings of appellee's living arrangements.

---

1. Under CCES, the parties agree to be evaluated by a Ph.D. level psychologist for the purpose of generating recommendations as to a custody arrangement that is in the best interests of the children. The CCES process often results in custody agreements. If no agreement is reached, the CCES evaluator prepares a report that is submitted to the court and counsel. As part of the agreement to go to CCES, the parties agree that the court may consider the report prepared by the psychologist without requiring the testimony of the psychologist.

Appellant's demeanor when speaking about appellee was condescending, angry and dismissive of her.[2]

Appellee's testimony contrasted with appellant's in terms of demeanor and content. She was much calmer and in general more insightful as to her behavior and appellant's behavior. She testified as to her relationship with her mother, other persons in her life and, of course, the Child. She demonstrated her ability to maintain a degree of communication with appellant despite appellant's alienation. We found appellee's testimony credible. We found appellant's testimony to be deliberately deceptive.

The background facts are that the appellant has been employed for five years as a lineman for the telephone company. He is the son of a loving two-parent family. His family is very supportive of him and his relationship with the Child. On the other hand, appellee comes from what can be described as a fundamentally flawed and dysfunctional family. Appellee's mother has done little to support appellee. In fact, appellee did more to raise her own mother than the other way around. Appellee had the burden of providing both financial and emotional support for her mother. In addition, appellee was burdened with providing financial and emotional support for a physically and intellectually challenged foster sister. She became involved with a paramour who turned out to be

2. In crafting this opinion, we only work from the notes of testimony from the September 8, 2005 hearing, along with our personal notes of the entirety of the proceeding. Appellant failed to order the transcript of the October 24, 2005 hearing in which he and others testified. Therefore our references to the transcript is limited to the first hearing.

a drug dealer. While all about appellee seemed to be both dysfunctional and socially disabled in one sense or another, there was no evidence that appellee suffered any of those maladies.

Appellee's familial background and her choice of romantic partners are only of interest to the extent that they impact her present circumstances and her ability to provide a stable, safe, secure and nurturing environment for the rearing of a young child. The sole issue to be decided in a custody proceeding between contending parents is the best interest of the child. In order to insure such a focus, our law has long recognized that the scope of inquiry should be directed to the effect that the totality of the parent's total environment has on the child. *Lombardo v. Lombardo,* 515 Pa. 139, 147, 527 A.2d 525, 529 (1987).

## DISCUSSION

In a child custody determination, the paramount concern must be the best interest of the child. In reviewing a custody order, the appellate court is not bound by findings of fact which are unsupported in the record, nor is the appellate court bound by the trial court's inferences drawn from the facts of record. However, on issues of credibility and weight of the evidence, traditionally the higher court will defer to the findings of the trial judge, who has had the opportunity to observe the proceedings and the demeanor of the witnesses. The trial judge is in a position to evaluate the attitudes, sincerity, credibility, and demeanor of the witness. Attitude is of particular importance in custody matters in that the court should consider, among other factors, which parent is more likely

to encourage and permit frequent and continuing contact between the child and the other parent. Where, as here, there is a high level of conflict between the parents, the willingness and ability of the primary custodial parent to cooperate with the other is critical to the dynamic of the parent/child relationship.

In rendering the disposition best suited to the protection of the child, the court must necessarily make certain value judgments driven by the peculiar personalities of the parties. In evaluating the factors impacting the physical, mental, and moral welfare of the child, the hearing court must take into account all interrelated issues that bear upon the child's welfare. After all is considered, the court must necessarily employ what is inherently an imprecise prediction about that child's future well-being. The considerations in straight custody proceedings, as well as in custody proceedings in connection with dependency proceedings, may include oral and written reports of psychologists, to the extent of its probative value. *In re Davis,* 502 Pa. 110, 465 A.2d 614 (1983). The reports prepared by CCES in this case were particularly helpful and were entirely consistent with our evaluation of the underlying facts.

An early conflict between the parents was that of the proper day care facility to be selected for the Child. Appellant demonstrated inflexibility and intransigence such as was illustrated by his unwillingness to be accommodative of appellee's continuing relationship with the Child. Appellant recognized the limited resources of appellee and was well aware that appellee would have difficulty in picking up and dropping off the Child if a day

care facility was selected at a location that was out of the course of appellee's route of travel to and from her place of employment. See N.T. at 37, 99-101. Despite that, appellant was not willing to agree to reasonable requests of appellee. On the other hand, appellee accommodated virtually every request of appellant as to day care and all other matters related to the Child. In the judgment of this court, appellee has been accommodative to an extreme extent to the wishes, whims and demands of appellant. While this is only one aspect of the issues which the court must consider in making custody determinations, we consider it to be a critical factor in this particular case.

Both parents currently are vitally concerned about the best interest of the Child and are firmly committed to carry out their roles as parents. Unfortunately, that was not always the case in respect to appellant. At the time of the Child's birth, appellant, who was not and never has been married to appellee, denied paternity, and had his attorney send appellee a letter demanding that she stop "harassing" him. N.T. at 22. He further insisted that pregnant appellee contact him only through his attorney. *Id.* He refused to see the Child except for three occasions during the Child's first nine months of life. On those occasions, he only saw the Child at the insistence of appellee. It was only after paternity tests confirmed that he was the father did he take any steps to interact with the Child on any level.

For the first two years of the Child's life, appellee had to live for short periods of time in a series of locations, not all of which were ideal for raising a young child.

Appellee was doing the best she could with what she had available to her; and at all times, she demonstrated extraordinary commitment to the Child in the face of daunting odds. She was forced to quit high school to take care of her mother who was suffering from emphysema, hepatitis, cirrhosis of the liver, cancer and alcoholism—all at the age of 47. She held down a series of menial jobs to provide for her mother. Due to her mother's mental instability, alcoholism and her medical infirmities, the mother was extremely critical and condemning of appellee. Appellee was able to look past the treatment she received from her mother to continue to take care of her.

Throughout all of that, in the last two and a half years appellee has had to battle through her mother's problems; her own struggles to make a living; and finally to struggle through this custody battle. Appellant did nothing to accommodate appellee when needed. In fact, in the midst of these custody hearings, appellant strongly criticized appellee for allowing a non-certified day care provider to baby-sit the Child during the day that she was in court answering to appellant's petition to obtain primary custody. Due to the extensive evidentiary presentations by appellant, the hearing did not conclude but continued to a subsequent hearing six weeks later. During that time, appellant refused to compromise with appellee to have the Child cared for at a day care center that was located between appellee's home and her job site. On top of that, when the hearing was re-commenced, appellant again attacked appellee for her allowing a family member to look after the Child while appellee attended to her mother who was then in a hospice facility

and who appellant knew, in fact, died during that interim period between the hearings.

Appellee maintained a stable, safe and nurturing home living environment for the Child despite all of the adversities thrown into her path. Remarkably, she provided adequate physical, emotional and developmental support for the Child. Appellant repeatedly asserted, without good cause, that appellee was not providing a safe environment for the Child, going so far as to lodge unfounded complaints with the children and youth agency. Appellee was thus compelled to frequently take the Child to medical service providers at the slightest suggestion of a cough, cold and any such minor medical situation. Appellee stated that she took the Child to the doctor 12-13 times from January to September alone. She explained the frequent visits thusly:

"I had Children and Youth call on me many times. I just want to cover myself. I take her to the doctor probably too much but I like to have everything noted." N.T. at 103.

Appellant then responded with the claim that appellee was taking the Child to doctors too frequently and unnecessarily. In effect, appellee is obliged to practice the equivalent of defensive medicine to avoid appellant's accusations.[3]

Appellee's life situation is considerably better presently. She resides in a single-family home where each

_____

3. We fear this pattern will only continue. Appellant's vigorous pursuit of primary custody shows no sign of abating. Appellee is left in a position where all her parental decisions are not only open to second-guessing, but are also litigated in court.

has their own bedroom, including a separate bedroom for the Child. The home is located on a large lot with ample play areas for the Child. Appellee shares that home with a young married couple who have been friends of appellee's for a long period of time, and with whom appellee had previously resided in an apartment. The home is spacious, clean and with more than adequate privacy to accommodate the needs of all without any inconvenience.

Much of appellant's cross-examination of appellee focused on the various living arrangements appellee had over the years. While a transient lifestyle is not ideal to a child, appellee strived the entire time to maintain a suitable life for her child, and we see no reason to strip primary custody from her because of these struggles. Those were episodic hardships, and we do not attribute them to any flaw in appellee's parenting skills. Furthermore, appellee's current housing satisfies this court; living with known friends, with an agreement to stay as long as she desires. N.T. at 33 and 91.

In this home, the Child has access to two additional persons for adult supervision. See N.T. at 112. The Child is appropriately cared for and is happy, healthy, and on track developmentally. N.T. at 112-14. She has her own room, her own bed and, most importantly, familial support in both homes. N.T. at 89-90.

Appellant himself has set up a home with a nuclear family to welcome the Child. Here she will be exposed to a step-sister and a half-sibling. Yet testimony has not shown or indicated that one home is either more or less loving than the other. While appellant has certainly created a lovely home, this court remains unswayed by appellant's

attempts to paint the living conditions in appellee's home as substandard or unsuitable for the Child.

Perhaps the dissension between the parties can be attributed to misunderstanding fueled ultimately by love for the Child. For example, appellant was upset about occasional diaper rash on the Child. While this may be an appropriate response for one concerned for the health of their child, it is not appropriate for appellant's concern for the Child to mutate into wrath toward the appellee. The diaper rash, in reality, came from a food allergy of the child. N.T. at 55. The Child's diet was adjusted in response. N.T. at 111. In this court's eyes, the diaper rash does not reflect poorly on either parent's parenting skills, but rather appellee's testimony on the precautions she takes helps illustrate her fitness as a parent.

Furthermore, appellant seems unable to respect appellee's role as mother by keeping her informed of significant developments. During one visit with appellant, the Child fell from a trampoline and broke her leg. Appellant, obviously concerned for the Child, brought her to the hospital. Appellant did not notify appellee of this serious injury to her child until a message was left on her answering machine at 1:30 in the morning, after they left the hospital. N.T. at 105. In contrast, the Child had the misfortune of breaking her leg earlier while at a day care facility which the appellant had selected for the Child.[4] When appellee arrived at the day care center to

---

4. It should be noted that this leg was broken at the day care under mysterious circumstances. The day care provider was investigated, but no action was taken. Neither parent is accused of, or suspected of, any child abuse.

retrieve the child, who appeared to be distressed, she immediately took the child to the hospital and immediately called appellant. He failed to come to the hospital in response to the call. N.T. at 95.

Determinations of custody at the trial court level require substantial on-site, hands-on parsing of credibility; sensing demeanor and sincerity as part of a trial judge's determination. Considerable weight should be accorded those determinations. Generally, only where a gross abuse of discretion is discerned should an appellate court interfere with the decisions of the hearing judge. *Commonwealth ex rel. Rainford v. Cirillo,* 222 Pa. Super. 591, 597-98, 296 A.2d 838, 841 (1972).

"In these situations, the courts may be an imprecise and frequently unwieldy tool in the 'selection and manipulation of a child's external environment as a means of improving and nourishing [the child's] internal development.' Goldstein, J., Freud, A. and Solnit, A., *Beyond the Best Interests of the Child,* at 7 (Freedom Press 1973) (hereinafter referred to as *Beyond Best Interests*). When a child's placement is disputed and subject to conflicting adult interests, the legal structure is 'confronted with a highly complex decision which involves, implicitly if not explicitly, a prediction about who, among available alternatives, holds most promise for meeting the child's psychological needs.' *Id.* at 6. While courts are not ideally suited to the task, they are, with the help of social agencies and input adduced from the parties at evidentiary hearings, the best qualified institution at this time to render the decision." *In re Davis,* 502 Pa. 110, 116 n.1, 465 A.2d 614, 616 n.1 (1983).

Of course, our findings should not be affirmed if our findings are "manifestly unreasonable as shown by the evidence of record . . . ." However, unless our determination represents a gross abuse of discretion, the higher court generally will not interfere with our order awarding custody. *Mumma v. Mumma,* 380 Pa. Super. 18, 21, 550 A.2d 1341, 1343 (1988); see also, *Commonwealth ex rel. Robinson v. Robinson,* 505 Pa. 226, 478 A.2d 800 (1984).

At the conclusion of the custody hearings, we denied appellant's petition for primary physical custody. We determined that it was in the Child's best interest to remain in the primary custody of appellee, with partial custody to appellant on the schedule specified in detail in the final order. There is no denying that the appellant remains committed to the Child, yet his obstinate nature and negative treatment of appellee remains an impediment to involving both parents in the Child's life. While appellant has certainly created a happy and healthy home in which Child would be welcomed, his relationship with appellee is so soured that we feel appellant's primary custody would significantly damage Child's relationship with Mother. In assigning primary custody to appellee, we have acted to keep both parents as an active part of the Child's life, something we feel is manifestly in the Child's best interest. We fear that if appellant is allowed to usurp primary custody, that he will continue his prior interference with appellee, to the detriment of the mother-daughter relationship. In a choice between two fit parents, we select the parent mostly likely to ensure those two parents remain in the Child's life.

We in no way deem appellant to be an unfit parent. We view appellant to be a competent parent whose continued exposure to the Child can only benefit her, and the custody order reflects our desire to maintain the father-daughter relationship. We strive to create a situation where both parents are factors in the Child's life.

For all of the above reasons, we entered our October 28, 2005 custody order denying appellant's petition seeking primary physical custody. We also deny the appellant's petition for contempt.