J-A20024-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| D.L.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| C.R.C. | |
| Appellee | No. 650 EDA 2014 |

Appeal from the Order Entered January 3, 2014
In the Court of Common Pleas of Bucks County
Civil Division at No(s): A06-05-62795-C-31

BEFORE: FORD ELLIOTT, P.J.E., MUNDY, J., and MUSMANNO, J.

MEMORANDUM BY MUNDY, J.: **FILED OCTOBER 07, 2014**

Appellant, D.L.M. (Mother), appeals from the January 3, 2014 order granting C.R.C. (Father) primary physical custody during the school year and Mother partial physical custody, of the parties' son, N.D.C., born in July 2004. After careful review, we affirm.

We summarize the relevant factual and procedural history of this case as follows. Mother filed the initial custody petition in this case on April 18, 2006, after the parties' separation. On February 14, 2007, the trial court entered a stipulated custody order, granting Mother primary physical custody, and Father partial custody on alternating weekends and every Monday and Wednesday evening. Trial Court Order, 2/14/07. In January 2012, Mother, together with N.D.C., and her older son, R.M., who is N.D.C.'s half-sibling, moved in with Father at his Southhamton, Bucks County

apartment due to her inability to maintain stable housing. N.T., 1/13/14, at 5-7. On November 28, 2012, Mother vacated the apartment with the children.

On December 5, 2012, Father filed a petition for contempt against Mother, wherein he alleged that Mother had not informed him of her whereabouts and had denied him partial custody of N.D.C. Petition for Contempt, 12/5/12, at ¶¶ 4-6. Further, Father alleged that Mother has a history of unstable living arrangements, and he requested legal and physical custody of N.D.C. and Mother to have supervised visitation. *Id.* at ¶¶ 7, 10. Also on December 5, 2012, Mother filed a Protection from Abuse (PFA) petition against Father in the Court of Common Pleas of Montgomery County, where she resided at the time. N.T., 1/3/14, at 6.

On January 5, 2013, upon agreement of the parties, without admission, prejudice, or findings of fact, a PFA order was issued against Father with respect to Mother and R.M., but not to N.D.C. *Id.* The PFA order was amended on July 22, 2013, to include that Father may have contact with Mother related to issues involving N.D.C. *Id.*

Following a hearing on Father's aforementioned petition for contempt, by order dated January 23, 2013, the trial court granted the parties joint

legal custody,[1] Father primary physical custody, and Mother partial custody on alternating weekends and on Tuesday and Thursday evenings. *Id.* at 6-7; Trial Court Order, 1/23/13. On January 25, 2013, Mother filed a petition to modify the custody order. Following a hearing on Mother's petition, the trial court issued an interim order on April 24, 2013, granting the parties joint legal custody and shared physical custody on an alternating weekly basis.[2] In addition, the interim order directed the parties to obtain a custody evaluation through the Court Conciliation and Evaluation Service (CCES), a private organization that performs custody evaluations in Bucks County. *See* Trial Court Order, 4/24/13; N.T., 1/3/14, at 7; Trial Court Opinion, 3/3/14, at 10, n. 4. By interim order dated May 7, 2013, the trial court again directed the parties to participate in the CCES process, granted Mother and Father shared legal and physical custody on an alternating weekly basis,

---

[1] The Child Custody Act (Act), 23 Pa.C.S.A. §§ 5321-5340, was applicable during the hearing on Father's petition for contempt and during all subsequent custody proceedings. *See C.R.F. v. S.E.F.*, 45 A.3d 441, 445 (Pa. Super. 2012) (holding that, if the custody evidentiary proceeding commences on or after the effective date of the Act, *i.e.,* January 24, 2011, the provisions of the Act apply). We note that the Act does not provide for "joint legal custody" as a type of award. Rather, the Act provides for "shared legal custody." *See* 23 Pa.C.S.A. § 5323(a)(6), (7) (types of award). As such, we deem the award of "joint legal custody" in this case as "shared legal custody" pursuant to Section 5323(a)(6).

[2] The Honorable Susan Devlin Scott presided over the custody hearing on April 24, 2013, and all subsequent custody proceedings, including that which is the subject of the instant appeal.

and directed that N.D.C. shall continue to attend Davis Elementary School in the Centennial School District, wherein Father resides, for the remainder of the school year. Trial Court Order, 5/7/13.

On May 24, 2013, Mother filed a petition requesting that the trial court waive the costs for the CCES process because she is proceeding *in forma pauperis* (IFP) in the custody action.[3] In the same petition, Mother requested that the CCES process not include joint sessions between her and Father. **See** Mother's Petition, 5/24/13, at ¶¶ 1-2. The trial court held a hearing on Mother's petition on July 30, 2013, and, by order the same date, the court vacated the April 24, 2013 order requiring that the parties obtain a CCES evaluation. **See** Trial Court Order, 7/30/13. This order also scheduled a full hearing on Mother's petition to modify the existing custody order. **Id.** In addition, at the July 20, 2013 hearing, the trial court directed that the parties maintain the "status quo regarding [N.D.C.]'s schooling [at Davis Elementary School in the Centennial School District] pending a full and complete hearing on the best interests of the child." Trial Court Opinion, 3/3/14, at 11.

The custody hearing was held on October 16, 2013, and December 16, 2013, wherein Mother was represented by counsel, and Father appeared *pro se*. The trial court heard testimony from Father, Mother, R.M., and N.D.C.

_____

[3] By order dated April 9, 2013, Mother was granted IFP status.

On January 3, 2014, the trial court delineated its findings and conclusions on the record in open court. N.T., 1/3/14, at 1-53. By written order the same date, the court granted the parties joint legal custody, Father primary physical custody during the school year, and Mother partial custody the first three weekends out of a four-week cycle. During the summer, the court granted Mother primary physical custody and Father partial custody the first three weekends out of a four-week cycle. In addition, the court set forth a vacation and holiday custody schedule. On January 31, 2014, Mother filed a timely notice of appeal.[4]

On appeal, Mother presents the following issues for our review.

> 1. Did the trial court err and abuse its discretion in denying Mother access to mediation and evaluation services through [CCES] when Mother validly objected to flaws in the CCES system that the trial court has established as the exclusive avenue for a person of limited means to obtain such services?

> 2. Did the trial court err and abuse its discretion when it based the January 3, 2014 custody order on a series of inferences that are legally erroneous and unsupported by the evidence in the record?

>> a. Did the trial court err and abuse its discretion in determining that [N.D.C.] should be separated for most of the year from his sibling, [R.M.], Mother's biological fourteen-year-old son, with whom [N.D.C.] lived from birth until January 2013? Relatedly, did the trial court err and abuse its discretion in

_____

[4] Mother and the trial court have complied with Pa.R.A.P. 1925.

concluding that [R.M.] poses a threat of physical harm to [N.D.C.]?

b. Did the trial court err and abuse its discretion in ordering Mother and Father to enroll [N.D.C.] at Centennial School District, the school district in which Father resides, in order to "maintain the status quo" without finding that attending Centennial School District was the schooling arrangement in the best interest of [N.D.C.]? Did the court further err in using its improper school enrollment decision as the basis for making inferences about Mother's ability to care for [N.D.C.]?

c. Did the trial court err and abuse its discretion in failing to weigh significant evidence bearing on stability in [N.D.C.] family life, specifically that Mother had primary physical custody of [N.D.C.] from his birth [in] July [], 2004, until an illegal order from the Court of Common Pleas of Bucks County divested her of primary physical custody on January 23, 2013?

d. Did the trial court err and abuse its discretion in concluding that Mother's "failed relationships" with … [F]ather and Mother's mother and brothers rendered her less capable than Father of maintaining a "loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs?" [ ]

e. Did the trial court err in finding that Father did not abuse Mother notwithstanding that another court had previously entered a [PFA] order against Father and in favor of Mother?

Mother's Brief at 6-7.

Our scope and standard of review of an appeal from a custody order are as follows.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**V.B. v. J.E.B.**, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

**A.H. v. C.M.**, 58 A.3d 823, 825 (Pa. Super. 2012), *quoting* **Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa. Super. 2006).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." **Saintz v. Rinker**, 902 A.2d 509, 512 (Pa. Super. 2006), *quoting* **Arnold v. Arnold**, 847 A.2d 674, 677 (Pa. Super. 2004).

Relevant to this case are the best interest factors set forth in Section 5328(a) of the Act, which provide as follows.

**§ 5328. Factors to consider when awarding custody.**

**(a) Factors.** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a). The trial court must consider each of these factors when entering an order either establishing or modifying custody. ***A.V. v. S.T.***, 87 A.3d 818, 822 (Pa. Super. 2014).

In her first issue, Mother argues that the trial court erred and abused its discretion by denying her the benefit of the CCES process. Specifically, Mother argues that, in vacating the order requiring the CCES evaluation, the court "punished [her] for exercising her right under Pennsylvania law to petition for court-ordered mediation through CCES at no cost."[5] Mother's Brief at 23-24. Mother's argument is premised upon her belief that the CCES "is a court-sponsored mediation program," and, therefore, as an IFP litigant, the cost is waived pursuant to Pennsylvania Rules of Civil Procedure 240(f) and 1904.5. ***Id.*** at 29.

We begin by noting that mediation is a specifically defined term in the Rules of Civil Procedure regarding custody cases.

> **Rule 1940.2. Definitions**
>
> As used in this Chapter, the following terms shall have the following meanings:

---

[5] To the extent Mother argues the trial court's actions regarding CCES violated her procedural due process and equal protection rights under the Fourteenth Amendment to the Federal Constitution, that argument is waived as it was not raised in Mother's Rule 1925 statement. ***See In re B.C.***, 36 A.3d 601, 605 (Pa. Super. 2012) (stating, "the Rule 1925[(a)(2)(i)] statement cannot be used to raise a claim for the first time on appeal[]") (citation omitted).

> "Mediation" is the confidential process by which a neutral mediator assists the parties in attempting to reach a mutually acceptable agreement on issues arising in a custody action. The role of the mediator is to assist the parties in identifying the issues, reducing misunderstanding, clarifying priorities, exploring areas of compromise and finding points of agreement. An agreement reached by the parties must be based on the voluntary decisions of the parties and not the decision of the mediator. The agreement may resolve all or only some of the disputed issues. Parties are required to mediate in good faith, but are not compelled to reach an agreement. While mediation is an alternative means of conflict resolution, it is not a substitute for the benefit of legal advice.
>
> …

Pa.R.C.P. 1940.2. The Rules also note that parties who are proceeding IFP need not pay the cost of "court-connected mediation services[.]" *Id.* at 1940.5(a)(1), Note.

A prior trial court decision in Bucks County described CCES as follows.

> Under CCES, the parties agree to be evaluated by a Ph.D. level psychologist for the purpose of generating recommendations as to a custody arrangement that is in the best interests of the children. The CCES process often results in custody agreements. If no agreement is reached, the CCES evaluator prepares a report that is submitted to the court and counsel. As part of the agreement to go to CCES, the parties agree that the court may consider the report prepared by the psychologist without requiring the testimony of the psychologist.

*Smith v. McCollum*, 77 Pa. D. & C.4th 1, 3 n.1 (Bucks 2005).

In its Rule 1925(a) opinion, the trial court explained its decision, as follows.

- 11 -

> Mother was granted [IFP] status … based on the praecipe submitted by her trial counsel, which certified that she was providing free legal service to Mother and believed Mother was unable to pay the costs of litigation. Pa.R.C.P. 240(d). Mother never provided a statement of her income. As IFP, Mother was not required to "pay any cost or fee imposed or authorized by Act of Assembly or general rule which is payable to any court or Prothonotary or any public officer or employee." Pa.R.C.P. 240(f)(1). Rule 240 "applies to court-connected mediation services as well, so that [IFP] parties without sufficient resources may file a petition seeking a waiver or reduction of the costs of mediation." Pa.R.C.P. 1940.5, note [].

Trial Court Opinion, 3/3/14, at 9. However, the trial court stated that the "CCES is not a 'cost or fee' within the meaning of Rule 240(f); it is a subsidy that is awarded to applicants based on their financial ability to pay for the evaluation." *Id.* at 10. In addition, the trial court explained that the CCES is not a mediation service. The trial court stated, as follows:

> [CCES] is not a mediation service, but a means to have an expert render an opinion on a proper custody arrangement.[4] The Court has a small budget for subsidizing CCES fees. Applicants may qualify for a subsidy based on their current income level and other applicable factors. The amount of the subsidy is awarded on a sliding scale relative to the applicant's income.
>
> _____
> [4] CCES is a conciliation and evaluation process that does not force the parties to come to an agreement. If conciliation is not possible, the evaluator notes it and the parties proceed to a hearing. CCES is not a mediation process that arrives at a final agreement. CCES is a private organization that has a yearly contract with the court to do custody evaluations.

*Id.* at 9-10. In this case, the trial court stated, "it was not possible to determine Mother's eligibility for a CCES subsidy because [Mother] would not state her income. Given this, we vacated the Order that the parties go through the CCES process." *Id.* at 10.

We discern no error of law or abuse of discretion by the trial court in determining that CCES is not a mediation service. CCES, as described by the trial court of Bucks County, lacks the characteristics of "assist[ing] the parties in identifying the issues, reducing misunderstanding, clarifying priorities, exploring areas of compromise and finding points of agreement[.]" Pa.R.C.P. 1940.2. Rather, CCES allows for parents to be "evaluated by a Ph.D. level psychologist for the purpose of generating recommendations" of the expert evaluator. *Smith*, *supra*. As a result, we reject Mother's argument that the trial court erred in vacating its order requiring that the parties obtain an evaluation through CCES. As the trial court noted, "Mother was not disadvantaged by [the trial court's] decision. Neither party was able to use the CCES process. Both parties presented their case directly to [the trial c]ourt in a full and complete custody hearing." *Id.* at 11. Therefore, Mother's first issue on appeal fails.[6]

_____

[6] In light of our resolution of this argument, we need not resolve Mother's argument as to whether, if the parties had used CCES, the trial court erred in ordering joint sessions, as this argument is now moot. *See* Mother's Brief at 38-40.

- 13 -

In her second issue, Mother argues the trial court abused its discretion in its application of the statutory best interest factors. Specifically, Mother raises five sub-arguments with regard to the custody factors. First, Mother argues the trial court erred when it separated N.D.C. from his half-sibling, R.M. Mother's Brief at 40. Second, Mother avers the trial court erred in ordering the parties to enroll N.D.C. at Davis Elementary School. *Id.* at 47. Third, Mother claims the trial court failed to consider that Mother had primary physical custody of N.D.C. from the time of his birth until January 23, 2013. *Id.* at 50. Mother's fourth sub-issue is that the trial court erroneously considered Mother's failed relationships with her mother and siblings. *Id.* at 54. Fifth, Mother avers the trial court erred in finding that Father did not abuse her. *Id.* at 56. To the extent Mother's arguments can be construed that the trial court erred in its credibility and weight of the evidence determinations, we decline to re-weigh the evidence in this case, as we are bound by the determinations made by the trial court. *See V.B., supra* at 820 (stating that this Court defers to the trial court with respect to issues of credibility and weight of the evidence) (citation omitted).

In this case, the trial court thoroughly considered the Section 5328(a) factors on the record in open court on January 3, 2014. N.T., 1/3/14, at 9-30; *see also* 23 Pa.C.S.A. § 5323(d) (providing that the trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order"). Furthermore, in its Rule 1925(a) opinion, the trial

court incorporated its analysis of the Section 5328(a) factors, placed on the record in open court on January 3, 2014, and specifically addressed Mother's asserted errors. *See* Trial Court Opinion, 3/3/14, at 1-9, 11-12.

The trial court concluded that the separation of N.D.C. and R.M. was outweighed by the level of conflict and animosity between the half-siblings. Trial Court Opinion, 3/3/14, at 4. The trial court also concluded that any issue stemming from its interim order directing N.D.C.'s enrollment at Davis Elementary School was moot. *Id.* at 11. As to Mother's previous award of primary physical custody, the trial court noted that this Court has held "a parent's role as primary caretaker does not entitle that parent to any extra weight." *Id.* at 2, *citing* **M.J.M. v. M.L.G.**, 63 A.3d 331, 338 (Pa. Super. 2013) (stating, "our Legislature has rejected the notion that in analyzing both parents, additional consideration should be given to one because he or she has been the primary caretaker[]"), *appeal denied*, 68 A.3d 909 (Pa. 2013). The trial court also concluded that it only relied on Mother's failed relationships to "show that there is less stability in Mother's family support systems and relationships, not that [Mother] is 'less capable' of providing care." *Id.* at 8. Finally, as to Mother's allegations of Father abusing her, the trial court noted that none of the incidents alleged by Mother amounted to physical abuse or threats thereof. *Id.* at 6-7. The trial court further noted that Mother's allegations "seem to center around Father being concerned about [N.D.C.]'s welfare and Mother's resentment of any comments

criticizing her care." *Id.* at 6. The trial court also concluded that it was not bound by the PFA order because, "the PFA was entered by agreement without admission, so [there was no] judicial determination as to whether abuse occurred." *Id.*

Upon careful review, we discern no abuse of discretion, as the record supports the trial court's custody decision. Therefore, we adopt the March 3, 2014 opinion of the Honorable Susan Devlin Scott as our own for the purpose of addressing Mother's second issue on appeal.[7] *See* Trial Court Opinion, 3/3/14, at 1-9, 11. The parties are directed to attach redacted copies of the trial court's opinion in the event of further proceedings.[8]

Based on the foregoing, we conclude all of Mother's issues on appeal are either waived or devoid of merit. Accordingly, the trial court's January 3, 2014 order is affirmed.

Order affirmed.

_____

[7] To clarify, we do not adopt the portion of the trial court's opinion regarding Mother's first issue on appeal, which we discuss above. We also do not adopt the trial court's discussion of Mother's third issue in her Rule 1925 statement, which Mother did not include in her brief on appeal. *See* Trial Court Opinion, 3/3/14, at 9-11, 11-12.

[8] The copies shall include the redacted names of Mother, Father, N.D.C., and R.M.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/7/2014

DO NOT PUBLISH

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
### FAMILY DIVISION

D.L.M                  :        NO. A06-05-62795-C

     v.                :

C.R.C.                 :


Case Number: 2005-62795   C   124
Receipt: Z1068087    Judge: 31
Code: 5076           Filing: 10484499
Patricia Bachtle - Bucks Co Prothonotary
B09           3/3/2014 9:00:26 AM

### SUPPLEMENTAL OPINION

D.L.M.             ("Mother") has appealed our January 3, 2014 Order ("Order"),

which granted joint legal custody of the parties' minor child, N.D.C.        to Mother

and C.R.C.            ("Father"), primary custody during the school year to Father,

and primary custody in the summer to Mother. When we entered our Order, we placed

the factual background and our reasons in an "on the record" opinion (cited hereinafter

as "Opinion"), and we incorporate that Opinion by reference in this Supplemental

Opinion. We will supplement our Opinion in light of Mother's Concise Statement of

Errors Complained of on Appeal. We will first address the issues relating to our

analysis under the custody factors, and then address the remaining issues.

Concise Statement 4 states verbatim: ·

> *The Court erred and abused its discretion in entering its January 3, 2014*
> *custody order by failing to weigh significant evidence bearing on stability in*
> *N.D.C.'s family life. See 23 Pa. C.S. § 5328(a)(4). Specifically, in*
> *evaluating the "need for stability and continuity in the child's . . . family life"*
> *the Court did not consider that Mother had primary physical custody of*

RECEIVED

MAR 1 1 REC..

DAVID HICHMIA

*N.D.C. from his birth on July 3, 2004, until an illegal order of this Court divested her of primary physical custody on January 23, 2013.*

Mother's previous status as the "primary caretaker" is not a proper consideration. The Superior Court has held that under the revised custody law, a parent's role as primary caretaker does not entitle that parent to any extra weight. *M.J.M. v. M.L.G.*, 63 A.3d 331, 338 (Pa. Super. 2013). In rejecting the "primary caretaker doctrine," the Court explained:

> If the Pennsylvania Legislature intended for extra consideration be given to one parent because of his or her role as the primary caretaker, it would have included language to that effect. Stated another way, the absence of such language indicates that our Legislature has rejected the notion that in analyzing both parents, additional consideration should be given to one because he or she has been the primary caretaker. . . . The considerations embraced by the primary caretaker doctrine have been woven into the statutory factors, such that they have become part and parcel of the mandatory inquiry.

*Id.*

We did deal with the statutory factors for both parents as stated in our Opinion. Moreover, we found that granting Mother primary physical custody would be detrimental to N.D.C. need for stability and continuity, which is factor number 4 in section 5328. *Opinion*, pp. 20-22. When Mother exercised primary physical custody, the record shows this custody was characterized by instability and uncertainty, which we found to be adverse to N.D.C.'s best interests and which is likely to continue in the near future. Also, N.D.C. is doing well in his current school, Davis Elementary, has friends there, and is happy. Ex. F-4; (N.T., 10/16/13 pp. 36, 47). Despite this, Mother would change N.D.C.'s school, which would be the third school change in five years. Mother has

2

63x

moved six or seven times since N.D.C. 's birth, which is nearly once a year.[1] (N.T., 12/16/13 pp. 75-76). She currently lives in Salvation Army Faith Transitional Housing Program. *Id.* at 85. She testified that "at this point I'm not sure" where she plans to reside when the lease expires in May, 2014. *Id.* at 80. N.D.C. 's older half-brother, R.M., was unable to recall the last time he felt he had a home. (N.T., 10/16/13 p. 137). As a result, we found that in the present and near future Father can offer a more stable environment for N.D.C.

Finally, in Concise Statement 4, Mother asserts "this Court" entered an "illegal order" on January 23, 2013. We initially note that this Order was not entered by the undersigned, but, rather by another Judge of this Court. Mother did not appeal the January 23, 2013 Order. Instead, she filed a Petition to Modify on January 25, 2013. It is improper for Mother to assert the prior, unappealed Order was illegal in this custody proceeding.[2] Moreover, we did not give weight to the January 23, 2013 Order in determining our Custody Order, except that Mother was held in contempt of the then-existing custody order. (See Exhibit C-5, pp. 2-3).

Concise Statement 5 states:

*The Court erred and abused its discretion in entering an order on January 3, 2014 awarding Father primary physical custody of N.D.C., during the school year because this custody arrangement will cause N.D.C. to be raised separate and apart from his sibling, R.M.  , Mother's biological fourteen-year-old son, with whom N.D.C. lived from birth until January 2013. The Court's order is in contravention of the policy of the Commonwealth that siblings reside together. See 23 Pa. C.S. §§ 5328(a)(4), (a)(6); see, e.g., In the Interest of H.V., 37 A.2d 588, 595 (Pa. Super. Ct. 2012).*

---

[1] Specifically, Mother testified that since N.D.C.'s birth, the family has resided in: Bristol Boro, Neshaminy, Warminster, Langhorne, Southampton (with Father), and Norristown (currently). (N.T., 12/16/13 p. 75).

[2] Mother has asserted that we agreed it was an illegal order. We never made that statement.

3

The policy that siblings reside together is only one factor to be considered in a child custody determination, and it is not controlling. *L.F.F. v. P.R.F.*, 828 A.2d 1148, 1152 (Pa. Super. 2003). In this case, it was outweighed. First, we were determining the custody arrangement for only one of the two half-brothers. Second, the half-brothers have frequent conflicts, which poses a safety concern for N.D.C., who is younger and smaller. (N.T., 10/16/13 p. 48). There is no question that R.M. and N.D.C. love each other; the issue was how much time they should spend together. We concluded the nature of the relationship between N.D.C. and R.M. is such that they should have some time together, but not the majority of the time together.

Father detailed the level of conflict between N.D.C. and R.M. (N.T., 10/16/13 pp. 49-51). He testified that R.M. "would always be hurting [N.D.C.]." *Id.* at 49. Father gave examples of R.M. "[g]rabbing [N.D.C.] by the neck, trying to trip him backwards on cement." *Id.* Father stated that R.M. attempted to engage N.D.C. physically once or twice per week. *Id.* at 50-51. Based on this credible testimony, we found the children fight physically frequently. (N.T., 10/16/13 p. 49).

Even Mother admitted there is animosity between the boys. (N.T., 12/16/13 pp. 24, 28). Mother blames this on Father for favoring N.D.C. *Id.* at 24. In the course of one fight, R.M. (then 14 years old) threatened to stab N.D.C. (then 8 years old). (N.T., 10/16/13). Moreover, we are concerned that Mother seems to take R.M.'s side following the fights and to defend R.M.'s actions while not expressing a similar concern for N.D.C. For example, in the PFA petition, Mother stated 8 year old N.D.C. "bullied" 14 year old R.M. Ex. C-1. On the other hand, Father is appropriately concerned for N.D.C.'s safety, and views his role as protecting N.D.C. (N.T., 10/16/13 p. 32).

4

65x

Therefore, we found it in the best interest of N.D.C. to spend some time with R.M., but not the majority of time.

Concise Statement 6 states:

*The Court erred and abused its discretion in concluding that R.M. poses a threat of physical harm to N.D.C. based on an isolated verbal threat that R.M. made against N.D.C. in November 2012.*

*a. The conclusion that R.M. poses a threat of physical harm is not supported by the sum of the evidence introduced at trial. The evidence at trial showed that R.M. did not cause N.D.C. physical harm during the many years the boys lived together.*

*b. The conclusion that R.M. poses a threat of physical harm is undermined by the Court's conclusion that Mother should have primary physical custody of N.D.C. during summer vacations when R.M. and N.D.C. will not attend school and will be together most often.*

*c. The Court's conclusion that R.M. poses a threat of physical harm to N.D.C. is inconsistent with the Court's conclusions regarding the threat of harm to N.D.C. posed by Father. The Court attached great weight to an isolated, verbal threat that R.M. made against N.D.C. in November 2012. At approximately the same time, Father engaged in an act of physical violence against Mother that resulted in Mother obtaining a protection from abuse order against Father. The Court gave this incident no weight in fashioning a custody order.*

As explained above, the relationship between N.D.C. and R.M. was only one out of sixteen total factors that weighed in favor of Father having primary physical custody during the school year and Mother primary custody during the summer. This allows the boys to spend some time together, just not the majority of the time. Although Mother characterizes the conflict between the boys as "an isolated, verbal threat," as detailed above, the boys fight frequently and there is some animosity between them. Moreover, we found the verbal threat consistent with the relationship between the children as testified to by both parents. Further, Mother does not express the same concern for N.D.C.'s safety as Father does when the boys fight.

5

In this Concise Statement, Mother implies Father poses a threat of physical harm to N.D.C.. The record does not support this. Father testified that his job was to protect N.D.C.. (N.T., 10/16/13 p. 32). Mother admitted Father never abused N.D.C.. *Id.* at 205. Over the course of the hearing, there was no allegation or evidence that Father has ever abused N.D.C..

We note that there is a PFA between the parties and they must abide by it. However, Father testified that his lawyer advised him to consent to the PFA and save his money for a custody hearing.[3] (N.T., 12/16/13 p. 128). Under the PFA, Mother and R.M. are the protected parties, not N.D.C.. Ex. C-2. The parties agreed to amend the PFA, so Father could have contact with Mother limited to issues involving N.D.C.. *Id.*

As we stated in our Opinion, the PFA was entered by agreement without admission, so we did not have a judicial determination as to whether abuse had occurred. Therefore, we heard evidence on the issue of abuse since it is factor two under section 5328 of the custody law. At the conclusion of the hearing, we found there was no abuse. Mother used the buzzwords of abuse—i.e., she "doesn't feel safe," "feels threatened" by Father and is "afraid" of Father— but her descriptions of the incidents did not substantiate her sweeping claims of abuse. The allegations of abuse, as we stated in our Opinion, seem to center around Father being concerned about N.D.C. 's welfare and Mother's resentment of any comments criticizing her care. Our conclusion was based on the following evidence:

Mother testified that on the day after Thanksgiving 2012, while in Father's apartment (where she was living at the time), she heard R.M. threaten to stab N.D.C.

---

[3] Ironically, Father was not able to continue to pay legal fees (his income is $12.00/hour) so he was unrepresented at the October 16, 2013, December 16, 2013, and January 3, 2014 hearings. Mother was represented by her pro bono lawyer at these hearings.

6

She ran to the kitchen, where the children were fighting, and Father joined them. (N.T., 12/16/13 p. 18). There, Father told Mother and R.M. to leave his apartment. *Id.* at 20. Mother objected, but she did leave for several hours. *Id.* Mother then returned and the parties engaged principally in a verbal dispute. Both parties agree that Father shoved Mother at some point. However, Father testified that he shoved Mother after Mother shoved him. (N.T., 10/18/13 p. 30). Mother did not comment on this assertion of Father's. We found Father credible on this issue. The evidence does not support Mother's characterization of Father's action as "an act of physical violence."

Mother also asserted that Father "falsely imprisoned" her on the same day. *Id.* at 215. However, her testimony was that Father was attempting to prevent her from re-entering the apartment. *Id.* at 216. That is not false imprisonment.

Mother also generally alleged Father "stalked" her. *Id.* at 217. Her testimony was that Father would look in her mother's house when he came to pick up N.D.C.. *Id.* Father's presence was not random; he was at the house to transport N.D.C.. That is not stalking. Father credibly testified that at the custody exchanges, he "would never see [Mother]. Never, ever see her . . .. The door would open. N.D.C. would come out. I'd drop him off, same thing." *Id.* at 70.

Mother's other alleged incidence of abuse occurred when N.D.C. was eight months old, which was the last time the parties had contact until Mother called Father on New Year's Eve 2011. *Id.* at 182. Mother stated that Father criticized her care of N.D.C. while she was on the sofa holding N.D.C.. *Id.* Mother asked Father to leave, and he left. *Id.* Mother characterized this as "intimidation." *Id.* at 212. That is not abuse.

7

R.M. testified that Father's apartment "was a hostile environment." *Id.* at 127.

When asked to explain, he testified that Father gave them "dirty looks" and made faces

at them. *Id.* Again, that is not abuse. Except for the allegation of shoving on the day

after Thanksgiving 2012, there was not even an assertion of physical abuse or threats

of physical abuse. Based on the foregoing evidence, we concluded that Father did not

abuse Mother.

We also note that when Mother's mother (N.D.C.'s grandmother) asked Mother

to leave her house, where the children had been living for four years, Mother called

Father, and Father took them in New Year's Eve 2011 and they lived together until the

day after Thanksgiving 2012. *Id.* at 209. Prior to Mother calling Father on New Year's

Eve, the parties had virtually no in-person contact since N.D.C. was 8 months old.

Concise Statement 7 states:

> *The Court erred and abused its discretion in concluding that Mother's*
> *"failed relationships" with R.M.'s father and Mother's mother and brothers*
> *rendered her less capable than Father of maintaining a "loving, stable,*
> *consistent and nurturing relationship with the child adequate for the child's*
> *emotional needs." See 23 Pa. C.S. § 5328(a)(9).*

We noted these relationships because they show that there is less stability in

Mother's family support systems and relationships, not that she is "less capable" of

providing care. N.D.C. testified how the relationship at his grandmother's house

deteriorated:

> [T]here was a person in the house, which was mom's brother, and he's
> been in jail a lot of times, and he does drugs, and Mom finally snapped at
> him and told him off. And then her mom got involved, then the uncle got
> involved, my uncle, . . . and then the next morning we — my mom called
> my dad, and we stayed there for a while . . . .

8

(N.T., 12/16/13 p. 104). N.D.C. no longer has contact with any member of Mother's family. N.D.C.'s emotional needs are not met by Mother's unstable, inconsistent family situation.

Now, we will turn to the Concise Statements that relate to interlocutory orders and are moot on appeal. First, Concise Statement 1:

> The court erred and abused its discretion by imposing illegal conditions on Mother's participation in CCES mediation services. In an order dated April 24, 2013, the court required Mother and Father to obtain an evaluation by CCES. Mother, who is proceeding in forma pauperis, sought by motion to have the fee for the CCES evaluation waived. Additionally, Mother has a protection from abuse order against Father in connection with physical violence she suffered in November 2012, and Mother objected by motion to participating in the CCES mediation process, which mandates joint counseling sessions with both parents. On July 30, 2013, in response to Mother's motion asserting these illegal conditions, the Court vacated its order requiring a CCES evaluation, thus denying Mother the benefit of the CCES process.

Mother was granted in forma pauperis status ("IFP") based on the praecipe submitted by her trial counsel, which certified that she was providing free legal service to Mother and believed Mother was unable to pay the costs of litigation. Pa.R.C.P. 240(d). Mother never provided a statement of her income. As IFP, Mother was not required to "pay any cost or fee imposed or authorized by Act of Assembly or general rule which is payable to any court or prothonotary or any public officer or employee." Pa.R.C.P. 240(f)(1). Rule 240 "applies to court-connected mediation services as well, so that [IFP] parties without sufficient resources may file a petition seeking a waiver or reduction of the costs of mediation." Pa.R.C.P. 1940.5, note.

The Court Conciliation and Evaluation Service of Bucks County ("CCES") is not a mediation service, but a means to have an expert render an opinion on a proper

9

custody arrangement.[4] The Court has a small budget for subsidizing CCES fees. Applicants may qualify for a subsidy based on their current income level and other applicable factors. The amount of the subsidy is awarded on a sliding scale relative to the applicant's income. Whatever amount the applicant qualifies for is then paid out of the court fund to the evaluator. CCES is not a "cost or fee" within the meaning of Rule 240(f); it is a subsidy that is awarded to applicants based on their financial ability to pay for the evaluation. It is not a question of cost waiving; it is who will pay the psychologist. In 2012, the court funds budgeted for CCES subsidies were exhausted by mid-year. Therefore, anyone who could not afford CCES fees in the second-half of 2012 did not attend CCES; CCES is not mandatory. Since then, applications for CCES subsidies have been closely scrutinized. In this case, it was not possible to determine Mother's eligibility for a CCES subsidy because she would not state her income. Given this, we vacated the Order that the parties go through the CCES process.

Mother also objected to the CCES process due to the final PFA she obtained against Father. She was concerned not only with her "safety during joint sessions," but with the prospect of "com[ing] and go[ing] at the same time and place as the defendant . . . giv[ing] the defendant information about the protected party's schedule and movements." Petition of D. L. M.          , 5/24/13, p.9. We note that on January 3, 2014, we found that there was not abuse. Given Mother's resistance to CCES, we vacated the Order directing the parties to go obtain a CCES evaluation. (N.T., 7/30/13 p. 7).

---

[4] CCES is a conciliation and evaluation process that does not force the parties to come to an agreement. If conciliation is not possible, the evaluator notes it and the parties proceed to a hearing. CCES is not a mediation process that arrives at a final agreement. CCES is a private organization that has a yearly contract with the court to do custody evaluations.

10

Now, Mother complains that she was "denied the benefit of the CCES process." Mother was not disadvantaged by our decision. Neither party was able to use the CCES process. Both parties presented their case directly to this Court in a full and complete custody hearing.

Concise Statement 2 states:

*The Court erred and abused its discretion in requiring Mother and Father to enroll N.D.C. at Centennial School District, the school district in which Father resides, in order to "maintain the status quo" rather than to achieve the schooling arrangement in the best interest of the child. See 23 Pa. C.S. § 5328.*

This issue is moot on appeal. At the July 30, 2013 hearing, we directed the parties to maintain the status quo regarding N.D.C.'s schooling pending a full and complete hearing on the best interests of the child. (N.T., 7/30/13 pp. 13-15). This was an interim order. On July 30, 2013, we were not prepared to alter the schooling arrangement because we did not have evidence pertaining to the 16 custody factors of 23 Pa.C.S.A. § 5328. We entered an interim order to keep N.D.C. at the school he attended the prior year until we could fully consider what was in his best interest. On January 3, 2014, we entered a final order based on the evidence regarding the best interests of the child. Any decision from an appellate court regarding our July 30, 2013 Interim Order would have no effect. *See Ramer v. Ramer*, 914 A.2d 894, 899 (Pa. Super. 2006). Therefore, this issue is moot. *Id.*

Finally, we will address Concise Statement 3:

*The Court erred and abused its discretion in entering an order on January 3, 2014, awarding Father primary physical custody of N.D.C. during the school year without making a specific finding that the resulting custody arrangement was in the best interests of the child. See 23 Pa. C.S. § 5328.*

11

This is a non-issue. On January 3, 2014, we entered a custody Order after putting on the record our reasoning under section 5328 of the child custody law. Section 5328 states: "In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following. . ." 23 Pa.C.S.A. § 5328(a). By the language of section 5328, in considering the sixteen custody factors listed in section 5328, we determined the best interest of the child. To settle any question, we specifically find that it is in the best interest of N.D.C. that Father have primary custody during the school year and Mother have primary custody in the summer.

For the foregoing reasons, this appeal is without merit.

BY THE COURT:

SUSAN DEVLIN SCOTT, J.

Date: 3/3/14

12

73x